Roslyn EVERSON, Randy Fox, Stennis George, Brenda L. Sebastian, and Richard Idemudia, Plaintiffs,

v.

MICHIGAN DEPARTMENT
OF CORRECTIONS,
Defendant,

and

Linda Nunn and Tracy Neal,
Intervening Defendants.

No. 00–73133.

United States District Court, E.D. Michigan, Southern Division.

July 11, 2002.

lyn Everson, Randy Fox, Stennis George, Brenda L. Sebastian, Richard Idemudia.

Mark W. Matus, Marie Shamraj, Mich. Dept. of Atty. Gen., Corrections Div., Lansing, MI, for Michigan Dept. of Corrections, Bill Martin.

Deborah A. LaBelle, Ann Arbor, MI, Molly H. Reno, Ann Arbor, MI, Richard A. Soble, Soble & Rowe, Ann Arbor, MI, Patricia A. Streeter, Ann Arbor, MI, for Linda Nunn, Tracy Neal.

Kary L. Moss, Michael J. Steinberg, Amer. Civil Liberties Union Fund of Michigan, Detroit, MI, for American Civil Liberties Union Fund of Michigan, Womens Lawyers Ass'n of Washtenaw County.

### DECISION

COHN, District Judge.

There is hardly ever a political question in the United States which does not sooner or later turn into a judicial one.[1]

Eileen Nowikowski, John R. Runyan, Jr., Sachs Waldman, Detroit, MI, for Ros-

### TABLE OF CONTENTS

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 867
   A. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 867
   B. The Correctional Officer Positions . . . . . . . . . . . . . . . . . . . . . . . . . . . 867
   C. Relief And Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 867
   D. Decision And Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . 868
      1. Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 868
      2. Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 868

II. The Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 869
   A. Basic Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 869
      1. Federal Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 869
      2. State Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 869
   B. The Exemptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 869
      1. Federal Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 869
      2. State Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 870

---

1. Alexis de Toqueville *Democracy In America* 248 (J.P. Moyer and Max Lerner eds., Harper & Row 1996) (1832).

III. Precursors To The MDOC Effort To Make The Change........................870
     A. The United States Case..............................................871
     B. The Female Inmates Case ...........................................872

IV. Request For The BFOQ ....................................................873
     A. Gender Specific Assignment Committee................................873
     B. Director's Initiative ...............................................874
     C. The Application To The DCS .......................................876

V. The Case In Court Pre–Trial .............................................878

VI. The Trial .............................................................879
     A. The Issue .......................................................879
     B. The Trial Generally ..............................................880
     C. The Witnesses ...................................................880
          1. Plaintiffs .................................................880
          2. Defendants ................................................881
          3. Intervening Defendants ....................................885
     D. The Exhibits ....................................................885
          1. Plaintiffs' Relevant Exhibits ...............................886
          2. Defendants' Relevant Exhibits ..............................886
          3. Joint Exhibits..............................................887

VII. Statistics ...........................................................887

VIII. The Right Of Plaintiffs To Bring Suit...................................888

IX. The BFOQ ...........................................................889
     A. The Law Generally................................................889
     B. The Law Particularly.............................................889
          1. Female Prison BFOQ ........................................889
          2. No Reasonable Alternative .................................892
          3. Female Inmates Rights .....................................893

X. Findings ..............................................................893
     A. Facts...........................................................893
     B. Reasonable Alternatives ..........................................895
     C. Continued Incidents .............................................895

XI. The Intervening Female Inmates' Case ....................................895
     A. "The Harm To Plaintiffs Is Speculative And At Most Minimal"..............896
     B. "Since Plaintiffs Do Not Contest The Right Of MDOC To Make Gender
        Specific Tasking Assignments MDOC Is Entitled To Make The Tasks
        of CO And RUO's In The Housing Units Gender Specific"................896
     C. "Assigning Males To Housing Units Solely To Achieve Gender Neutrali-
        ty In Employment And Without Regard To Gender Differences Has
        Proven To Be A Mistake" ..........................................896
     D. "MDOC Is Obligated To Take All Reasonable Steps To Prevent Abuses
        From Continuing In The Female Prisons".............................897
     E. "Making Gender A BFOQ For Female Housing Unit Officers Is Reason-
        ably Necessary To Achieve MDOC's Core Mission".....................897

XII. National Profile of Corrections Officers In Female Prisons .....................898

XIII. Conclusion ..........................................................898

## I. Introduction

### A. Nature Of The Case

In this case, male and female corrections officers working for the Michigan Department of Corrections (MDOC) challenge the Michigan Department of Civil Service's (DCS)[2] approval of the MDOC's request to make female gender a bona fide occupational qualification (BFOQ) for the positions of Correctional Officer (CO) and Resident Unit Officer (RUO) in the housing units in the female prisons in Michigan.[3] The challenge comes in the form of a request by five CO's and RUO's[4] for a declaratory judgment that gender specific assignment to the positions of CO and RUO violates Section 703 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), and Section 207 of Michigan's Elliot–Larsen Civil Rights Act, M.C.L. § 37.2202.

In response, the MDOC says that the BFOQ exception in the statutes, found at 42 U.S.C. § 2000e–2(e)(1) and M.C.L. § 37.2208 applies to these positions, *i.e.* a gender specific qualification (female) for the positions is reasonably necessary to the normal operations of a female prison.

A group of female inmates in the custody of the MDOC are also parties to the case as intervening defendants. They too argue that only female correction officers should be permitted in female prisons.[5]

On September 28, 2000, the Court entered a temporary restraining order against implementation of gender specific assignment of CO's and RUO's in Michigan's female prisons, which continues in effect.

### B. The Correctional Officer Positions

The General Summary of Function/Purpose of Positions in DCS language of a CO reads:

Responsible for custody and security in a female housing unit. The goal is to provide a safe, clean, secure, and efficient environment while respecting the privacy of female prisoners, and enforcing rules and regulations.

The General Summary of Function/Purpose of Positions in DCS language for an RUO reads:

Responsible for custody and security in a female housing unit, as well as treatment responsibilities, primarily on the day and afternoon shift. The goal is to provide a safe, clean, secure, efficient living environment while respecting the privacy of female prisoners, and enforcing rules and regulations.

### C. Relief And Scope

Plaintiffs request the following relief:

A declaratory judgment that to make gender-based assignments to the Corrections Officer positions, Resident Unit Officer positions, as well as rover and transport positions at the Scott Correctional Facility, Western Wayne Facility, and Camp Brighton Facility is unlawful as a violation of the gender discrimina-

---

2. The Michigan Civil Service Commission, which heads the Department of Civil Service, *see* M.C.L. § 16.301, was not involved in the approval. The approval letters were signed by the Human Resources Manager of the Bureau of Human Resources Services of DCS.

3. There are currently three female prisons in Michigan: Scott Correctional Facility (Scott), Western Wayne County Correctional Facility (Western Wayne) and Camp Brighton.

4. Plaintiffs' motion for class certification, to which the MDOC has responded, has not been acted on by the Court.

5. Additionally, the American Civil Liberties Union Fund of Michigan, the Women Lawyers Association of Washtenaw County, and the American Friends Service Committee jointly filed a brief amici curiae in support of the MDOC's and female inmates' positions.

tion provision of Title VII, the provisions of the Elliott–Larsen Act, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[6]

On the date suit was filed, July 12, 2000, the MDOC operated two female prisons: Florence Crane Corrections Facility (Florence Crane), Scott and a female camp, Camp Branch. At that time, the MDOC was in the process of converting Western Wayne and Camp Brighton to female only prisons and closing down Florence Crane and Camp Branch. Approximately 267 CO and RUO positions are involved overall, of which approximately 60% are male.[7] A subset of the CO and RUO positions are transportation officer, intake officer, and rover.

## D. Decision And Preliminary Statement

### 1. Decision

For the reasons which follow, which constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52, the Court finds that plaintiffs are entitled to a declaration that the MDOC has failed to sustain its burden that gender is a BFOQ for CO and RUO's in the housing units in female prisons, that it is reasonably necessary to their normal operations, and that there is no reasonable alternative to employing female corrections officers in such positions. This is not to say, however, that in the staffing of such positions the MDOC may not, where security and personnel implications are involved for both the CO's and RUO's and the female inmates, exercise discretion to make female gender specific assignments for certain *tasks*.[8]

### 2. Preliminary Statement

At the conclusion of trial, the Court made preliminary findings which are memorialized in the Memorandum filed March 23, 2001, stating:

The Court is dissatisfied with the record as it stands now, as a basis for decision. The Court's appointment of an expert, under Fed.R.Evid. 706, is desirable to examine, and report to the Court on, the privacy interests of female prisoners. The parties are entitled to comment. The proposed expert and scope of the expert's activity was named in the record, as well as the Court's expectations of the expert witness. What is necessary for the Court, in its decision, is to strike the right balance among the following fundamental principles:

First, there should be no blanket ban on the employment of one sex in a prison for members of the opposite sex;

Second, prison employees who are not permitted to perform certain tasks

---

**6.** This Decision is limited to plaintiffs' statutory claims.

**7.** There are 445 bargaining unit positions in the three female prisons. Of the 445 positions, 267 positions are held by CO's and RUO's, of which 94 are CO's and 174 are RUO's. Approximately 70 to 75 male corrections officers would be affected by the change. It is likely 23 would be transferred to other prisons and the remaining 47 would be otherwise affected. All of the 267 affected positions could lose opportunities for overtime work and promotion. The MDOC has publicly stated it would endeavor to keep dislocations to a minimum. The MDOC and the Michigan Corrections Organization (MCO), SEIU Local 526M, AFL—CIO, the bargaining agent for the corrections officers, have apparently never engaged in any meaningful discussions about the proposed change.

**8.** One of the themes running through this case are limitations imposed by the collective bargaining agreement governing the affected corrections officers and, indeed, most of the employees of the MDOC. Where security and personnel implications are involved it does not seem that these limitations should be a barrier. Dealing with this, however, is for another day.

because of their gender should not suffer adverse consequences in their pay or benefits, promotion opportunities, or job security;

Third, gender classification should be used only where there are no reasonable and adequate gender-neutral means for advancing legitimate penal purposes; and

Fourth, there may be special circumstances in which job assignments must be limited on the basis of gender to insure inmates' rights to personal security and privacy.

*See* Memorandum, filed March 23, 2001, at p. 10–11.

The MDOC opposed the appointment of a court-appointed expert and the Court did not follow through on obtaining an expert. Consequently, the Court must decide whether or not female gender is a BFOQ for full time corrections officers in the housing units of the female prisons in Michigan based on the evidence presented at trial. It does not go unnoticed that this decision is being made in an adversary proceeding rather than by an administrative decision on a fully informed record subject to judicial review. As will be described, the DCS did no more than rubber stamp the MDOC's request for a BFOQ. The Michigan Civil Rights Commission (MCRC), the state agency nominally assigned the task of reviewing such a request, was deliberately bypassed. This is a poor way to establish prison personnel policies and forces a judicial determination of a question that is, or should be, the result of an informed and reasoned policy determination.

## II. The Statutes

### A. Basic Laws

#### 1. Federal Law

42 U.S.C. § 2000e–2(a) reads:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

#### 2. State Law

M.C.L. § 37.2202 reads:

(1) An employer shall not do any of the following:

. . . .

(b) Limit, segregate, or classify an employee or applicant for employment in a way which deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion, race, color, national origin, age, sex, height, weight, or marital status.

. . . .

### B. The Exemptions

#### 1. Federal Law

##### a.

42 U.S.C. § 2000e–2(e) reads:

Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal op-

eration of that particular business or enterprise....

.  .  .  .  .

**b.**

29 C.F.R. § 1604.2 elaborates on the exception reading in part as follows:

(a) The [Equal Employment Opportunity Commission] believes that the bona fide occupational qualification exception as to sex should be interpreted narrowly. Label—"Men's jobs" and "Women's jobs"—tend to deny employment opportunities unnecessarily to one sex or the other.

**2. State Law**

**a.**

M.C.L § 37.2208 provides for specific procedures to be followed for an employer to obtain BFOQ status for a particular employment position, stating:

A person subject to this article may apply to the commission for an exemption on the basis that religion, national origin, age, height, weight, or sex is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise. Upon sufficient showing the commission may grant an exemption to the appropriate section of this article. An employer may have a bona fide occupational qualification on the basis or religion, national origin, sex, age, or marital status, height and weight without obtaining prior exemption from the commission, provided that an employer who does not obtain an exemption shall have the burden of establishing that the qualification is rea-

sonably necessary to the normal operation of the business.

This section further states:

... An employer may have a bona fide occupational qualification on the basis of religion, national origin, sex, age, or marital status, height and weight without obtaining prior exemption from the commission, provided that an employer who does not obtain an exemption shall have the burden of establishing that the qualification is reasonably necessary to the normal operation of that business.

M.C.L. § 37.2208.

The MDOC, as an agency of the State of Michigan is subject to the requirements of M.C.L. § 37.2202 and the exemption provided for in § 37.2208. *See* M.C.L. § 37.2103(g) (defining "person" to include an "agency of the state.").

**b.**

Initially, it was represented to the Court that DCS Regulation 3.05, Selective Certification For Position—Specific Qualifications, established the procedure to be followed by a state agency such as the MDOC in obtaining a BFOQ for a particular position. However, the Court was subsequently advised that this was not the case and that:

the officials [in the DCS] who approved the request would have evaluated it with the standards of the Elliot–Larsen Civil Rights Act's exemption for bona fide occupational qualifications in mind.[9]

There is no evidence in the record to suggest DCS did this in evaluating MDOC's request.[10]

**III. Precursors To The MDOC's Effort To Make The Change**

The request to DCS by the MDOC "for selective certification to allow only female

---

**9.** *See* Letter from Assistant Attorney General to the Court, dated March 29, 2002.

**10.** Attached as Exhibit A is the Michigan Department of Civil Rights' application form for a BFOQ exemption.

staff as Corrections Officer and Resident Unit Officer positions with regular work assignments in housing units, segregation unit, [and] the intake unit [in the facilities] which house only female inmates" was made on August 20, 2000. It followed shortly after the settlements of two complex cases involving the MDOC (the court cases) brought separately by the United States (the United States case) and by a group of female inmates (the female inmates case) in 1996 and 1997. A brief summary of these cases follows. The complaints in these cases focused on operations and incidents at Florence Crane and Camp Branch.

### A. The United States Case

On March 10, 1997, the United States sued the State of Michigan in this district claiming that the constitutional rights of female inmates in the female prisons in Michigan were being violated in the form of sexual misconduct by male corrections officers and that the female inmates were subject to unlawful invasions of their privacy and that their serious medical and mental health needs were not being met. *United States v. State of Michigan*, No. 97–CV–71514.

After extensive discovery and a contentious course of in-court proceedings,[11] the medical and mental health claims were dismissed. The remaining issues dividing the parties were resolved in the form of a Settlement Agreement dated May 25, 1999. The settlement agreement in essence provided for:

—pre-employment screening of correctional staff particularly to determine fitness to work in a female prison

—specialized training for the staff in the female prisons

—inmate orientation regarding the subject matter of the settlement agreement

—facilitation of inmates and staff reporting of allegations of sexual misconduct, sexual harassment and overfamiliarity[12]

—timely and complete investigation of allegations of sexual misconduct

—minimization of one-on-one access to secluded areas, and the like, by male staff and female inmates

—effective response to substantiated instances of staff misconduct

—a knock-and-announce policy by male staff in areas where female inmates could be in a state of undress

11. The Department of Justice met with severe criticism from various state officials as its case moved forward. These officials generally claimed that the Department's charges were frivolous and represented an unwarranted intrusion by the federal government into state affairs. *See* "U.S. Alleges Sex Abuse of a Woman at 2 Prisons State Official Blasts Findings As Absurd," Detroit Free Press, Mar. 30, 1995, at 1A. For another example of the contentiousness, *see* "Human Rights Watch Challenges Michigan Subpoena To Reveal Confidential Information," available at http://www.hrw.org/press98/oct/michig1015 .htm.

12. Improper male staff-female inmate interaction is generally divided into three categories of descending seriousness: (1) sexual misconduct being the most severe and usually criminal; (2) sexual harassment which is typically handled administratively; and (3) over-familiarization, which may subject the offending correction's officer to a letter of reprimand. Improper conduct by staff in a female prison is not confined to CO's and RUO's in the housing units. It is found among all male staff members and there appears to be no firm evidence that it is principally found among the CO's and RUO's in the housing units.

—severe restrictions or pat-down searches by male staff of female inmates

—Department of Justice monitoring of the settlement agreement to assure compliance and eventually dismissal of the case

Nothing in the settlement agreement called for gender specific assignment of CO's and RUO's in the housing units in the female prisons.[13] The settlement agreement recognized that changes in policy which implicated bargaining unit employees were subject to negotiation with the labor unions representing such employees as well as the Office of State Employees and the Civil Service Commission and subject to state law.

The changes in policies and procedures, relating to improper male staff-female inmate interaction, screening of applicants, training and education, physical facilities and reporting required by the settlement agreement have been implemented. The changes are numerous and far reaching and the consequences attendant upon these changes are yet to be fully realized.

### B. The Female Inmates Case

On March 27, 1996, a group of female inmates brought suit in this district against the MDOC and a number of state officials and corrections officers claiming sexual misconduct and sexual harassment in the female prisons. *Nunn v. Michigan Department of Corrections*, No. 96–CV–71416. Particularly, the plaintiffs claimed violations of the Fourth, Ninth and Fourteenth Amendments under 42 U.S.C. § 1983 and asked for damages and injunctive relief. Again, after extensive discovery and a contentious course, the case was settled, this time in two parts. First, plaintiffs' monetary claims were settled for $3,787,000.00 with $2,390,700.00 being distributed among 31 named female inmates. Second, on July 31, 2000, the claim for injunctive relief was settled substantially along the lines of the settlement agreement in the United States case.

Significantly, however, the settlement agreement in the female inmates' case regarding injunctive relief included the following statement:

Consistent with the MDOC's announced intention to limit the assignment of staff in facility housing units to female officers, the MDOC will make a good faith effort to accomplish this objective during the monitoring period. If such efforts are still ongoing at the end of the monitoring period, monitoring will be extended as to this issue only for not more than two additional six month periods.[14]

---

**13.** Human Rights Watch, which monitored the case, *see* n. 10, *supra,* in a letter dated June 11, 1999, complained to Attorney General Janet Reno that the settlement proposed in the case was inadequate. It did not, however, suggest gender specific assignment. *See* "Letter to Attorney General Janet Reno," available at http://www.hrw.org/press/1999/jun/reno-ltr611.htm.

**14.** The 2000 Annual Report of the MDOC available at http://www.michigan.gov/documents/2000annualreport—2420—7.pdf, describes in some detail the settlement agreements, stating in part:

Both lawsuits have resulted in a number of major changes in the way female prisoners and staff interact both in prisons and corrections centers. They resulted in revisions to policies dealing with sexual harassment and misconduct, including combining several of these policies; screening of staff through LEIN and other checks; a requirement for male officers to "knock and announce" their presence in any areas where inmates could be in a state of undress; a committee to review retaliation charges against staff; uniforms for female prisoners (as well as for all prisoners); and exploration of the feasibility of excluding males from working in female housing units.
2000 Annual Report of the MDOC at p. 71–72.

## IV.  Request For The BFOQ

### A.  Gender Specific Assignment Committee

Sometime in 1998, the Director of the MDOC appointed a Gender Specific Assignment Committee (GSAC)[15] consisting of a number of high level MDOC officials, including the Special Administrator for Female Offenders Programs, with the following Mission:

*Mission:*

The Gender Specific Assignments Committee (GSAC) is charged with (1) reviewing assignments within correctional facilities for the feasibility of making them gender specific, (2) evaluating the positive and negative impacts such assignments would have on the work force, and (3) providing recommendations to Director McGinnis.

The Committee's Statement of the Problem read:

*Statement of the Problem:*

The issues surrounding privacy and gender specific versus cross-gender supervision have been litigated in state and federal courts since the 1970's.  The common legal bases for challenging cross-gender supervision are:

First Amendment—violation of religious tenets

Fourth Amendment—unreasonable search and seizure

Eighth Amendment—cruel and unusual punishment

Fourteenth Amendment—Equal Protection clause.

Numerous cases have pitted inmates' right to privacy against the right of female and male correctional officers to equal employment opportunity.  Unfor-

tunately, this issue does not yet have a definitive answer since the courts have reached differing conclusions.

The questions central to any discussion of gender specific assignments are:  (1) Under what circumstances is it appropriate for staff of one sex to observe inmates of the opposite sex in some state of undress, and (2) can inmate privacy interests be strong enough to preclude staff of the opposite sex from holding certain posts in a correctional facility?  The Committee has identified the following concerns as a context in which to examine these questions:

(1) Security of the institution and safety of staff and inmates

(2) Equal Employment/Affirmative Action for staff while complying with labor laws and bargaining agreements

(3) Customs (mores) surrounding states of undress

(4) Inmates' past trauma history regarding members of the opposite sex

(5) Support/opposition from the external environment (e.g., labor and human rights organizations and the general public).

While the Mission Statement appears to suggest a study of both male and female prison staffing, its real concern was directed to the staffing of the female prisons.

The GSAC published an interim report on September 15, 1998 and a final report on December 11, 1998.

The GSAC, in its final report, made a number of recommendations regarding various *tasks* and the need to have staff assignments to these tasks on a gender specific basis.  The GSAC did not, howev-

---

**15.**  A 1990 Policy Directive of the MDOC, P.D. 02.06.100, stated the MDOC's Equal Employment Opportunity Affirmative Action Policy in conventional terms and included a standard BFOQ definition as well as a prohibition on discrimination because of "race [etc.] sex [etc.] except where the Michigan Department of Civil Rights has granted a Bona Fide Occupational Qualification (BFOQ)."

er, recommend female gender specific assignment of CO's and RUO's in the housing units in the female prisons. It did discuss the staffing of the housing units under a subheading, *3rd Shift Housing*, as follows:

> The Committee was unable to agree. Four of six recommend MDOC more toward gender balance through attrition. The prevailing opinion among wardens is to have gender balance when possible, but not to make it a requirement. This would accommodate one person assignments and those which may decrease to one officer when a medical emergency occurs.
>
> One Committee member recommends gender specific assignments in female facilities; another recommends gender specific assignments in both male and female facilities. The dissenting four do not believe gender specific assignments are a viable option presently due to the labor pool and union contracts; however, some states have voluntarily implemented gender specific assignments on specific shifts through letters of agreement with the corrections officers' union or have responded to various threats/instances of court intervention.

In sum, the GSAC did not recommend a female BFOQ for CO and RUO's in the housing units on the first shift (6AM to 2PM) or the second shift (2PM to 10PM) and voted 4–2 against having female only CO and RUO's in the housing units on the third shift (10PM to 6AM).

## B. Director's Initiative

Bill Martin (Martin) was appointed director of the MDOC sometime in early 1999.[16] On June 25, 1999, he issued a Director's Office Memorandum, 2000–33, stating the policy changes required to implement the settlement agreement in the United States case. Two of these policy changes are particularly relevant to the issue here:

*Knock and Announce—Women's Institutions Only*

> L.L. Absent compelling circumstances or reasonable suspicion of unauthorized activity/rule violations, male staff assigned to ACF, CDW, and SCF shall verbally announce their presence prior to entering an area where prisoners could be in a state of undress.

*Pat Down and Clothed Body Searches—Women's Institutions Only*

> M.M. Pursuant to Policy Variance # 2239 effective through February 1, 2000 for P.D. 04.04.110 "Search and Arrest of Prisoners, Employees and Visitors" and absent exigent circumstances or a reasonable suspicion that a prisoner is in possession of contraband, pat down and clothed body searches of female prisoners shall be conducted *only* by female staff.

Pat down searches of female inmates by male corrections officers is a particularly contentious issue in the administration of female prisons.[17]

---

**16.** Martin's testimony is discussed further in Part VI. C., *infra.*

**17.** *See Jordan v. Gardner,* 986 F.2d 1521 (9th Cir.1993) (Policy requiring male prison guards to conduct random, non-emergency, suspicion less clothed body searches of female inmates is cruel and unusual punishment in violation of the Eighth Amendment). *See also* Teresa A. Miller, *Sex & Surveillance: Gender,* *Privacy & the Sexualization of Power in Prison,* 10 Geo. Mason U.Civ.Rts.L.J. 291 (Summer 2000); David J. Stollman, *Jordan v. Garner: Female Prisoners' Right To Be Free From Random, Cross–Gender Clothed Body Searches,* 62 Fordham L.Rev. 1877 (1994); and Mushlin, *Rights of Prisoners,* 2d Ed. § 8.11—Use of Opposite Sex Corrections Personnel in Prison Searches.

Although under the policy directive, the suspension of pat down searches in female prisons in Michigan is only temporary, the suspension is still in effect. There was no good explanation offered by the MDOC for why, except in extraordinary circumstances, should pat down searches need ever be done by male corrections officers. However, this raises an issue of *task* specific assignments, not whether the MDOC is entitled to a BFOQ so as to preclude male corrections officers from working at all in female prisons.

On October 13, 1999, Martin issued another Director's Office Memorandum, 2000–33A, further implementing policies required by the settlement agreements in the court cases, including:

T. **Knock and Announce Policy.** Absent exigent circumstances or reasonable suspicion of unauthorized activity/rule violations, male corrections officers shall verbally announce their presence before entering areas where prisoners normally could be a state of undress. Wardens and supervisory staff will prepare written guidelines for staff identifying the areas where this policy shall apply and describing the manner in which the announcement is to be given. In order to prevent reporting of conduct that is permissible under this policy, the guidelines shall be posted temporarily and a copy maintained in the prison library. This policy will be a subject of on-the-job training for corrections officers by supervisory staff.

U. **Pat down Searches.** Should the Department decide to resume the routine search of prisoners by male officers, supervisory staff will routinely observe line staff conducting pat down searches and give instructions or guidance as needed.

On December 9, 1999, Martin formally announced his intention to remove "male officers" from the female prisons.[18] The announcement stated:[19]

**Director decides to make staffing changes at women's prisons**

Director Bill Martin has determined that staffing for female facilities will require changes.

The decision was made after consultation with the Office of the Attorney General on the legal aspects of the choice. In announcing his decision, Martin said: "In recent weeks, I have gone to Crane, Scott and Camp Branch and met with employees there to inform them I was considering this move. Many of the male officers I spoke with complained that a mere allegation of sexual contact by a female prisoner has significant impact on both their family and professional career, even if the allegation is subsequently determined to be unfounded. I have been listening carefully to what our officers have been saying. I am convinced that the single best way to protect these officers' professional and personal lives is to remove them from those assignments in which they are most vulnerable. I told the officers I spoke with that the only way I could think of accomplishing this would be to remove them from that housing unit assignment."

---

18. On October 12, 1999, Martin told the Michigan House of Representatives, House Appropriations Subcommittee on Corrections, that he was considering a change to gender specific assignments in both the male and female prisons. *See* "State Examines Gender–Based Roles for Correction Officers," *The*

*Michigan Daily*, Oct., 13, 1999, available at http://www.pub.umich.edu/daily/1999/oct/10–13–99/news/news21.html.

19. A copy of this statement is available at http://www/state.mi/us/mdoc/FYI/12–9–99/announce.html.

"I can appreciate the concern employees probably have after hearing of this decision. I have already begun meeting with union officials on this move, and I believe if all parties work cooperatively, we can minimize the disruption on affected employees. I hope to move as quickly as possible after the first of the year on these reassignments but at the same time be as accommodating to employees as possible. Every attempt will be made to keep employees informed of the time table for these changes as soon as it is determined."

At the time he made his announcement, Martin was unaware of the GSAC's analysis and recommendations. Nothing in any internal memoranda of the MDOC such as reports from the wardens of the female prisons, special or monthly minutes of meetings between staff and female inmates, mention the desirability or need to remove male CO and RUO's from the housing units in the female prisons. There was no evidence offered at trial of any consultation by Martin with the Michigan Department of Civil Rights or the Attorney General of Michigan regarding the change.

On December 11, 2000, Martin approved a detailed policy directive styled "Prohibited Conduct In Facilities Housing Female Prisoners," directed to the "affirmative steps to guard against sexual harassment and sexual misconduct between prisoners and staff." In the directive, responsibility for overseeing and monitoring compliance with the terms of the settlement agreements in the court cases was assigned to the Special Administrator for Female Offenders Program.[20]

On May 5, 2001, the 1990 Policy Directive [21] was amended to exclude any requirement that a BFOQ request be submitted to the Michigan Department of Civil Rights.

## C. The Application To The DCS

### 1.

Three applications to the DCS were filed on August 2, 2000 by the Personnel Director of the MDOC. Separate applications were filed for Scott, Western Wayne, and Camp Branch. At that time Florence Crane was in the process of closing down as a female prison and Camp Brighton had not yet opened. Each application described each particular CO and RUO position for which a BFOQ classification was requested. Each application stated:

This is a request for selective certification to allow only female staff at Camp Branch, which houses only female inmates, in Corrections Officers and Resident Unit Officer positions with regular work assignments in housing units which include segregation units. Their custody and security duties include those that affect the privacy of female prisoners such as observing showers, observing inmates dressing and undressing, observing inmates using toilet facilities, and conducting multiple daily searches (including strip searches).

As indicated in the attached report, a mission of the Michigan Department of Corrections is to provide a safe, secure environment, respecting the privacy of prisoners, specifically females, while providing staffing consistent with the appropriate federal and state laws regarding equal employment opportunity. The MDOC has been involved with litigation relevant to sexual misconduct between male staff and female prisoners

---

**20.** The Special Administrator peculiarly was not called as a witness by any party at trial. On reflection, the Court should have insisted on hearing from the Special Administrator as

the MDOC official most likely knowledgeable about conditions in the female prisons.

**21.** *See* n. 14, *supra.*

and their privacy rights. In addition, the Department recently entered into a settlement agreement of the *USA v. Michigan 97-CV-71514-DT*, which alleged that inmates in Michigan women's prisons were subject to sexual misconduct, sexual harassment, overfamiliarity and invasion of privacy by staff.

The Department has made a number of changes responding to allegations of inappropriate behavior and complaints regarding privacy of female prisoners. These include physical plant modifications, policy, procedure, and employee handbook changes, improvements in staff training, staffing level increases, and improving prisoner education. However, it is felt that these changes will not eliminate inappropriate behavior or sexual misconduct.

Accordingly, we are requesting that the indicated positions be selectively certified for female staff only to occupy the positions. The following reasons are cited for this request; same sex supervision would enhance the privacy of female prisoners, reduce the likelihood of sexual misconduct, the reduction of fear of sexual misconduct will enhance the ability of the Department to achieve its mission, security capabilities would be improved due to much less reluctance by female staff to perform observation duties, and female staff only in housing units would reduce the likelihood of instances where individual male staff and individual female prisoners would be involved in long isolated contacts. The request is being made for the following position numbers:

Each application included a number of documents and particularly a Consultant/Expert Witness Report by Michael J. Mahoney,[22] who was a witness in the court

cases on behalf of the MDOC. The conclusion of Mahoney's report states:

> In spite of the comprehensive nature of the above identified activities, it is the conclusion of this Consultant/Expert Witness that female prisoner supervision by the Michigan Department of Corrections for the following limited duties and assignments should be accomplished by female staff only in order to provide the necessary safe and humane conditions of confinement and the professional operations of the MDOC female correctional facilities:
> - All Housing Unit RUO and CO assignments
> - Segregation Unit RUO and CO assignments
> - Intake RUO and CO assignments

Included in materials submitted with each application were expert witness reports from the court cases. These included the report of Kay Monaco, an expert witness in the female inmates case who stated in her recommendations:

> Consistent with the requirements of Title VII equal opportunity employment mandates, staff all housing units at Crane and Scott with female staff only until such a time as the incidents of sexual misconduct have been substantially reduced.

Annabelle M. Romero,[23] another expert witness in the female inmates case stated in her recommendations:

> Consistent with the requirements of Title VII equal opportunity employment mandates, male correctional officers should not be assigned to posts that include duties inside dormitories, toilet and dressing areas in the women's prisons. Male officers should "knock and announce" their presence when they en-

---

**22.** Mahoney's testimony at trial is described in Part VI. C., *infra.*

**23.** Romero testified at trial. *See* Part VI. C., *infra.*

ter one of these areas, unless they are entering the area because of exigent circumstances. If male officers continue to be assigned supervisory duties in female living quarters, a period of at least 30 minutes should be allotted during each shift when male staff are not allowed in female dormitories or restrooms. One on one inmate and staff cross gender work, recreation, housing, or transport situations should be completely eliminated.

Consistent with the requirements of Title VII equal opportunity employment mandates, areas housing juveniles in adult facilities, mentally ill inmates, or inmates on detention should be staffed by female officers only. Inmates in these categories are especially vulnerable and the extent of harm possible to these inmates is severe. Thus, a greater degree of care should apply.

### 2.

The DCS approved the MDOC's applications 12 days later, on August 14, 2000, stating:

> Based on the Position Description (CS-214) and the information provided in your letter, the selective certification criterion approved for this position is as follows:
>
>> Allow only female staff in Corrections Officer and Resident Unit Officer positions with regular work assignments in housing units, segregation units, or the intake unit at the Scott Correctional Facility, which houses only female inmates. Their custody and security duties include those that affect the privacy of female prisoners such as observing showers, observing inmates dressing and undressing, observing inmates using toilet facilities, and conducting multiple daily searches (including strip searches).

There is no evidence to suggest any meaningful consideration by the DCS of the applications, particularly any consultation with the Michigan Department of Civil Rights or the Attorney General of Michigan. Additionally, not explained was why the DCS granted selective certification in 2001 when it rejected a prior request by the MDOC for a BFOQ for six positions in 1985, stating:

> Although we agree that all issues are not identical to those in the Griffin [24] case, we do not agree that there is adequate justification to consider this a bona fide occupational qualification. It also appears that restricting certain positions to female only would lead to claims by males that their promotional opportunities were being restricted—the exact opposite of the Griffin situation.

The conclusion to be drawn from the speed with which the applications were approved, is that the DCS rubber-stamped the MDOC's requests.

### 3.

Moreover, there is nothing in any publication of the MDOC to suggest that the "privacy of prisoners, especially female" as the term privacy is conventionally used, is a mission of the MDOC. Indeed, security, not privacy, is a more appropriate focus for a prison. *See Dothard v. Rawlinson,* 433 U.S. 321, 335, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) ("the essence of a correctional counselor's job is to maintain prison security"). However, Martin, in his introductory letter to MDOC's 2000 annual report, states "What we're about is serving the citizens of Michigan with a cost-effective operation, one that manages convicted felons in a safe and humane manner."

### V. The Case In Court Pre–Trial

A summary of the salient pre-trial events follows.

---

**24.** *See* n. 30, *infra.*

The complaint was filed on July 12, 2000 with two CO and two RUO's as named plaintiffs. Defendants were the MDOC and Martin, in his official capacity and individually. A jury was demanded. Count I claimed a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1). Count II charged a like violation of Michigan's Elliott–Larsen Civil Rights Act, M.C.L. § 37.2202(1)(a). Count III claimed damages under 42 U.S.C. § 1983 in the form of loss of wages, promotional opportunity and other benefits. Plaintiffs requested a declaratory judgment, permanent injunction, back pay, compensatory damages, and punitive damages as relief. Defendants answer in essence denied the allegations of the complaint and asserted a BFOQ defense.

On September 5, 2000, two female inmates moved to intervene.

On September 20, 2000, plaintiffs moved for a preliminary injunction against "implementation [of the] plan to make gender-specific assignments and/or to allow any female staff to hold Correctional Officer and Resident Unit Officer positions with regular work assignments in housing units, segregation units and/or intake units at the Robert Scott, Western Wayne and Camp Branch Correctional Facilities."

At the hearing on the motion for preliminary injunction on September 22, 2000, the Court stated it would issue a preliminary injunction as requested and on September 28, 2000, entered a temporary restraining order, combining the trial on the motion for preliminary injunction with the trial on the merits and set an early trial date. A day before, on September 27, 2000, the Court approved the filing of a first amended complaint adding a third RUO as a party plaintiff.

On October 6, 2000, the Court bifurcated the claim against Martin in his individual capacity and stayed it pending resolution of the BFOQ issue, obviating the need to deal with his qualified immunity defense.

On October 13, 2000, the Court granted the female inmates the right to intervene to enable them to "participate in the defense of plaintiff's challenge to the gender-specific assignments in the housing and living areas of the Michigan women's prisons, including the right to appeal." *See* Memorandum And Order Granting Intervention, filed October 13, 2000 at p. 7.[25]

On December 7, 2000, the Court bifurcated the issue of damages and stayed discovery pending resolution of the issue of liability. Plaintiffs waived their right to a jury on the issue of liability only.

## VI. The Trial

### A. The Issue

The sole issue at trial was the right of the MDOC to limit the CO and RUO positions in the housing units in the female prisons to females. CO and RUO's are the only correctional officer positions in the housing units whose job duties require a presence throughout the entire three eight-hour shifts each day.

While there were references on the record to intake, rover, and transportation officer positions, the selective certification sought by the MDOC from the DCS was for the CO and RUO positions. Presumably, intake, rover, and transportation officer positions are a subset of the CO and RUO positions. These positions were not discussed particularly at trial.

A subsidiary issue at trial was whether or not the plaintiffs have made out a prima facie case of an adverse employment action

---

25. The female inmates are represented by the same lawyers who successfully prosecuted the female inmates court case.

as a consequence of the MDOC limiting the CO and RUO positions to females. The MDOC and the intervening defendants asserted that the plaintiffs at most have shown only inconvenience as a consequence of the change and this is not sufficient to give them standing to complain.

### B. The Trial Generally

The trial extended over nine days in February and March 2001. Testimony and exhibits were largely devoted to the benefits and burdens to female prison operations of limiting full-time housing officers in a female prison to females in light of the potential for sexual assault, sexual harassment and overfamiliarization when male corrections officers have custodial responsibility in the housing units. Also covered in the testimony was the spotted record of the MDOC in operating female prisons, particularly reflected the record made in the court cases and their settlements, as well as the privacy concerns involved when male corrections officers have custodial responsibility for female inmates. Since the DCS, acting on the request of the MDOC for selective certification proceeded *ex parte*, the record of its BFOQ consideration of the materials submitted to it reflected no substantive consideration, the trial was the first occasion at which the BFOQ issue was meaningfully debated.

### C. The Witnesses

#### 1. Plaintiffs

Plaintiffs called seven witnesses. They were:

—Harley Stock, a psychologist, who testified to the ready availability of tests that can and should be used to screen prospective corrections officers to assure reduction in the number of unsuitable candidates for such positions in female prisons. Stock further testified as to his success in using such tests and that a 1995 study upon which the MDOC relied to conclude that psychological testing did not work was flawed.

—Edda Cantor, a retired New Hampshire Department of Corrections official, who expressed the opinion based on experience that gender-restricted assignments in housing units in female prisons were unnecessary to reduce the incidence of sexual misconduct in such facilities and less restrictive alternatives are available. Cantor was of the opinion that given the changes occurring in female prisons in Michigan as a result of the settlement of the court cases, it is too early to assess the impact of the requirements and limitations required by the settlement agreements. The measures required under the settlement agreement were, in Cantor's opinion, viable alternatives to gender-restricted assignments in the housing units.

—Bridget Gladwin, a retired New York State corrections official, who stated that correction practices in New York and nationally have established cross-gender supervision as the norm. Gladwin described her experience in rooting out staff sexual misconduct in New York prisons for females where she found that in management, few, or no rules, and little or no supervision were the cause of these events. Gladwin expressed the opinion that inmate privacy can be accommodated through the use of

such items as privacy screens, shower curtains, narrowing of windows, partial doors on toilets, and a knock-and-announce policy. Gladwin described the differences in managing and operating male and female prisons, the normalizing effect of cross-gender supervision and that inmate allegations against staff are a characteristic of operating a correctional facility, male and female, which can never be eliminated.

—Charles Ewing, a professor of law and psychology, testified that excluding male correctional officers from the housing units in female prisons is not necessary to the emotional health of female inmates even those who have a history of sexual abuse. Ewing was of the opinion that the presence of male correctional officers may have a normalizing and beneficial effect on female inmates previously abused by males.

—Bethany Beauchine, an employee of the MCO, the labor union representing employees of the MDOC including CO and RUO's, identified exhibits relating to sexual misconduct data compiled by the MDOC, exhibits relating to an analysis of male and female corrections officers in the female prisons and data relating generally to MDOC operations and practices.

—Richard Idemudia an RUO, testified as to the adverse employment consequences of removing male CO and RUO's from the housing units in the female prisons, particularly with regard to "bidding" for preferred positions, the wasting of specialized experience in dealing with female inmates and the likelihood of his being demoted to a CO position if he is removed from his position at Western Wayne as well as the severe personal dislocation he will experience if transferred.

—Lori Sahl, a CO at Western Wayne, testified to the disruption in her personal life which will occur if the third shift position at Western Wayne is limited to female staff in the housing units, as well as the effect on her ability to bid for a preferred position in the short term future because of the influx of new and inexperienced female CO's should the gender-specific plan go forward.

2. Defendants

The MDOC called eight witnesses. They were:

—Patrick McManus, a corrections professional, and the monitor named in the settlement agreements in the court cases, to report on compliance with their terms. McManus testified that the MDOC is in compliance with the requirements of the settlement agreements relating to required changes in policies and procedures, particularly the training called for by the settlement agreements. McManus expressed the opinion that while he initially was of the view that it was a mistake to require females only as CO and RUO's in the housing units in the female prisons he was now of the view that female officers only should staff female prisons. Significantly, McManus testified that his final report in the female inmates case on

compliance is not yet due and that he does not intend to recommend that the housing units have female CO's and RUO's only. McManus' final report in the United States case, submitted February 25, 2000, simply states that "The defendants are in substantial compliance with the provisions of the Settlement Agreement."

—George Camp, a former corrections official and currently a consultant in corrections matters, testified while he was originally of the opinion that a prison environment was normalized by cross-gender supervision, the incidents of sexual misconduct, including allegations, are too high a price to pay to continue the practice. In Camp's opinion, the knock-and-announce policy and the use of shades on the windows of cell rooms is a threat to security. Camp's survey of other prisons showed that while many states make gender-based assignments of female officers to housing units by means of maximizing staffing requirements, only four states have a BFOQ requirement. In response to questions from the Court Camp acknowledged that cross-gender supervision in male and female prisons required additional initiatives and that it was easier to have females supervise males than males supervising females, he knew of no studies to that effect.[26]

—George Sullivan, an experienced corrections professional, testified that while the MDOC had made substantial improvement in the operation of its female prisons and while females can work in male prisons, males working in a female prison is a mistake. Sullivan was of the opinion that this was not a sound management practice and the practice should be ended to insure the safety and security of female prisons. Sullivan is of the opinion that the American Corrections Association standards, which do not call for females only in female prisons, were deficient, as is the Federal Bureau of Prisons, in having male corrections officers in its female prisons. Sullivan, in his inspection of 22 female prisons and 24 facilities for female inmates, did not find a single one which limited corrections officers in the housing units to females. Of particular (and perhaps parochial interest) was Sullivan's testimony as follows:

> THE COURT: ... you think the only salvation for corrections policy rests in federal judges?
>
> THE WITNESS: As far as prison operations in contemporary America, I believe that because the only changes and improvements that have been made in prisons in my 46 years have been those that were handled by federal courts.

**26.** In particular, Camp was not knowledgeable about the General Accounting Office, December 1999 report, *Women In Prison: Issues And Challenges Confronting United States Correctional Systems* (which does not recommend female-only assignment in female prisons). Camp was also unaware of the Correctional Service of Canada's (CSC) *Cross–Gender Monitoring Project Third And Final Report,* dated September 30, 2000, which recommends female only corrections officers in female prisons in Canada. In response to an inquiry of the Court to the Commissioner of the Correctional Service of Canada regarding any follow up or response to the recommendation, a Senior Deputy Commissioner has advised the Court as follows:

> Following release of the ... report, CSC initiated a broad consultation process with regard to the [report's] main recommendation: to terminate cross gender staffing in Canada's women's prisons. Contrary to the findings outlined in the [report], the majority of parties consulted indicated that they were in favour of maintaining a percentage of men as frontline staff in the regional women's facilities and healing lodge.

The CSC is also awaiting a response from the Department of Justice Canada before finalizing its response.

—Michael Mahoney, an expert in corrections and President of the John Howard Association For Prisoner Reform,[27] a national organization, testified as to the opinion he expressed in the June 2000 report to the MDOC described above, which formed the basis for the MDOC's request to DCS for selective certification. He testified that despite the improvements the MDOC has made to ensure the safety and humane conditions of confinement in its female prisons, assignment of CO's and RUO's in the housing units should be females only. This, Mahoney testified, would reduce the opportunity for, and fear of, sexual misconduct and diminished opportunity for overfamiliar relations and improve security. Mahoney acknowledged that the John Howard Association, one of whose purposes is to "monitor correctional facilities and programs in Illinois," has never recommended publicly and particularly to the State of Illinois that males should be excluded as corrections officers in Illinois female prisons. Mahoney was not familiar with the report of the GSAC described above, even thought it is listed in his report as having been reviewed.

—Jack Haynes, a psychologist, testified that in his opinion psychological testing cannot predict if a particular corrections official will engage in some form of inappropriate behavior with an inmate.

—Joan Yukins, an employee of the MDOC since 1975 and Warden of Scott since 1991, was called as a witness by the MDOC after the Court sharply observed that it appeared no official of the

MDOC except its director was going to testify. Yukins was not a member of the GSAC and was not consulted by Martin before the request for selective classification was made to the DCS. Indeed, she testified that she was "flabbergasted" when she heard what Martin had said to the committee of the Michigan House of Representatives [28] regarding female only corrections officers.[29] Yukins further testified that while she was initially of the opinion that female only corrections officers in the housing units were not necessary to adequately operate a female prison and had so testified in the female inmates case, she has since changed her mind and is now of the opinion that female only corrections officers are necessary. Yukins also testified that she there has never been a discussion among senior management of the MDOC regarding cross gender supervision so far as she knew, nor has the appropriateness of female-only corrections officers in the female prisons ever been an agenda item at any of the quarterly meetings of wardens which she attended, nor had she ever discussed the matter with her staff. Yukins acknowledges that the vast majority of male CO and RUO's perform their duties in a professional manner. Yukins did not see the request for selective certification or any of its attachments until her depositions was taken in this case.

—Martin, director of MDOC since June 15, 1999, acknowledged he had no prior experience in corrections except as a member of the state legislature.[30] Martin became director at the time when the court cases were in their most conten-

27. *See* http://www.johnhowardassociation.org/index.html.

28. *See* n. 17, *supra.*

29. *See* Trial Transcript of March 5, 2000 at p. 142.

30. Martin, after leaving the legislature, was appointed Commissioner of the Michigan State Lottery. On January 31, 2002, he resigned as MDOC director to become chief executive officer of the Michigan Association of Realtors.

tious period. Martin was of the opinion that despite improvements to the MDOC policies and procedures, training and physical facilities, sexual misconduct and allegations of sexual misconduct had not ended and removal of males from the female housing unit was necessary to bring the level of misconduct as low as possible. Martin was of the opinion that improvements in privacy have come at the expense of security in the female housing units. As director, Martin said he must have flexibility in determining how to best run the female prisons. Martin testified he has never done an empirical study of privacy initiatives in the female prisons in Michigan compared to other states; never asked his staff to do a survey; and was not familiar with the state prisons in which there were BFOQ's. Martin declined to testify on whether he had ever consulted the Attorney General on the legality of his request to the DCS and there is nothing in the record to suggest that he did. Martin said that the MDOC has met all the requirements of the settlement agreements in the court cases and acknowledged that many male CO's and RUO's in the housing units in the female prisons perform their jobs without engaging in any improper conduct. Martin, in addition to the matters described in Part IV.B., *supra,* further testified that he did not seek to include elimination of male CO and RUO's from the female housing unit in the settlement agreements, believing the change had to be initiated by the director, including sitting down with the MCO. Martin testified he initiated the effort to change to protect both the female inmates and the male corrections officers and for no other reason. Martin acknowledged that there had not been a sustained allegation of sexual misconduct against a corrections officer in a female prison for about two years. Martin, who was only vaguely familiar with the report of the GSAC, did not review personally the request for selective certification, did not get an opinion from the Attorney General on the legality of the proposed change, was not familiar with the 1982 decision requiring the MDOC to employ female officers in the male prisons [30] and had no familiarity with the expert reports in the two court cases.[31]

—Janet McCleland, a deputy director of the DCS, testified by affidavit as to the regulations relating to the request for selective certification and that the request was reviewed before being approved by the State Personnel Director

**30.** In *Griffin v. Michigan Department of Corrections,* 654 F.Supp. 690 (E.D.Mich.1982), a decision which was not appealed, another judge in this district found, as described in the introductory abstract:

[male] inmates did not possess any protected privacy right under Federal Constitution against being viewed while naked by correctional officers of opposite sex, and, thus, gender was not "bona fide occupational qualification" for correctional officers that would be in position to view inmates while naked; (2) probabilities of sexual assaults on female correctional officers and potential impact on prison discipline and rehabilitation opportunities were not of magnitude that justified making gender bona fide occu-

pational qualification; and (3) employment and promotional policies and practices violated prohibition against discrimination on basis of gender.

**31.** At the conclusion of Martin's testimony, the Court stated that based on what he said, it appeared that the MDOC, in requesting selective classification, relied solely on anecdotal evidence as well as Martin's personal inclinations. The Court further observed that from the day Martin came to MDOC he wanted to make the change and it made no difference to him what anybody told him. The Court was of this view in particular because Martin never requested, nor received, an opinion from the Attorney General as to whether making the change was legal.

and other civil service managers. (There is no evidence that this occurred.)

3. Intervening Defendants

Intervening defendants called six witnesses. They were:

—Robin McArdle, an inmate at Western Wayne who testified as to suffering childhood sexual abuse, a sexual assault(s) while an inmate at Florence Crane and in other female prisons, and the adverse effect on female inmates when males are their correctional officers.

—Brandy Nash, an inmate in various female prisons for more than three years, described the incidents of sexual assaults and sexual harassment she experienced by male correctional officers and the incidents of retaliation for reporting such conduct and the psychological trauma she suffered by being controlled and viewed by male correctional officers.

—Gladys Wilson, an inmate of various women's prisons for many years, testified as to the absence of sexual harassment, sexual assault, privacy violations and the like in the years before male correctional officers were assigned to female prisons. Wilson described the abuse she suffered prior to incarceration and how prior abuse has been magnified by being guarded by male corrections officers.

—Victoria Baldridge, a relatively recent inmate at Western Wayne, testified as to the absence of any orientation relating to sexual assaults and sexual harassment and incidents of abuse and invasion of privacy at the hands of male correctional officers.

All of the female inmates who testified expressed the opinion that male correc-

tional officers in the housing units adversely affected their efforts to rehabilitate themselves. Their testimony replicated evidence in the female inmates case.

—Terry Kupers, a medical doctor, testified on the impact of the presence of male corrections officers in the female housing units, the vulnerability of female inmates based on their history of prior abuse and the adverse consequences of the presence of male correctional officers in female housing units with particular emphasis on younger females.

—Annabella Romero, an expert in corrections work and an expert in the United States case, described the scores of interviews she did with female prisoners and staff regarding the sexual abuses in Michigan's female prisons. Romero also described the significant number of incidents of staff sexual abuse. Romero expressed the opinion that only female correctional officers should be assigned to the housing units in female prisons.

D. The Exhibits

Approximately 250 exhibits were received in evidence at trial. They included MDOC reports and minutes of meetings, staffing reports, training and reporting materials, layouts and photographs of housing units, inmate population data, incident data relating to sexual misconduct and other sanctionable conduct by corrections officers and other personnel, the request to the DCS for selective certification and the responses, position descriptions, court cases papers, expert witness reports, the collective bargaining agreements with the MCO, affidavits, published papers, curriculum vitae of the expert witnesses, narrative statements of direct testimony of the expert witnesses, ACA Standards and a miscellany of other papers relating to MDOC activities and management of prisons.[32]

32. In addition to the exhibits provided by the parties, the Court located several reports and

### 1. Plaintiffs' Relevant Exhibits

Plaintiffs' relevant exhibits were:

— Civil Service Job Specification and the MDOC Position descriptions for CO and RUO's (Px4–5)

— The MDOC request for selective certification (Px7–9)

— The impact of female only CO and RUO positions in the housing units in the female prisons in Michigan (Px10)

— Charts displaying sexual misconduct data 1994–2000 including allegations and dispositions in the female prisons (Px11)

— Detailed summaries of sexual misconduct allegations and dispositions in the female prisons (1994–2000) (Px13)

— The American Correctional Associations standards for Adult Correctional Institutions Third Edition (Px14–15)

— Letter to Court regarding Staffing of housing units in female prisons nationally (Px16)

— Settlement Agreement—United States Case (Px23)

— Settlement Agreement—Female Inmates Case (Px24)

— MDOC Director's Office Memorandum, 2000–33; 2000–33A November 11, 1999) detailing changes in policies and procedures for implementing settlement agreement in United States Case including reporting, conduct of investigation, tracking, minimization techniques, monetary, knock-and-announce policy, pat down search limitations, screening training and quality assurance (Px25)

— MDOC Investigations materials regarding grievances in women's prisons (Px26)

— Various MDOC materials relating to implementation of Settlement Agreements (Px27)

— 19999–2001 Collective Bargaining Agreement Between State of Michigan and MCO (Px28)

— Psychological testing materials (Px31–38)

— The Securior report, entitled "Raising the Standard' (Px39)

— Tabular listing of experts' recommendations in United States Case and MDOC actions taken in response including changes in shower curtains, toilet areas and cell door windows, knock-and-announce, limitations on pat down searches, grievance procedures, training, appointment of a Special Administrator for Female Offender Programs (Px46)

— Summary of 1999 and 2000 sexual misconduct reports (Px56)

— Application for Selection Certification to MDOC (Px57)

— DCS denial of MDOC request for selection certification (females) for six positions—1985 (Px63)

— Scott monthly reports to the Director January 1999 – January 2001 (Px66)

— Scott Warden's Forum Meeting—Minutes January 1999 – January 2001 (Px68)

— MDOC Memorandum from Yukins commenting Securior recommendations (Px69)

— EEO Affirmative Action Policy Directives, P.D. 02.06.100 – 12–17–90 and EEO Policy Directive P.D. 02–06–00 – 05–01–00 (Px70)

### 2. Defendants' Relevant Exhibits

Defendants' relevant exhibits were:

— McManus' final report on monitoring the MDOC Compliance with Settlement Agreement in United States Case (DxB–2)

— Order of Dismissal in female inmates case of August 17, 2000 ("The dismissal is conditioned upon Defen-

other documents regarding the rights of female inmates. These include the following: "Not Part of My Sentence" Violations of the Human Rights of Women in Custody in the United States, by Amnesty International, dated March 1999, available at www.amnesty.org/alibi/aipub/1999/25100199.htm; Human Rights Watch "All Too Familiar: Sexual Abuse of Women in U.S. State Prisons," December 1996, available at http://www.hrw.org/summaries/s.us96d.html,

and "Nowhere to Hide: Retaliation against Women in Michigan State Prisons," July 1998, available at http://www.hrw.org/reports98/women, and United Nations High Commissioner for Human Rights, "Standard Minimum Rules for the Treatment of Prisoners," available at http://www.unhchr.ch/html/menu3/b/h—comp34, htm, and "Women Offender Symposium: Through the Eyes of a Child," September 19–20, 2000, by the Minnesota Department of Corrections.

dant's substantial compliance with
The terms of the settlement agree-
ment." (DxC–2)

— Female Offender 1999/2000 Staff
Training Program (DxE–2)

— MDOC Policy Directive, o03.03.140—
Prohibited Conduct In Facilities (DxF–1)

Housing Female Prisoners—12/11/00

— Listing of measures taken to prevent
sexual misconduct in female prisons
(These include knock-and-announce
policy, one-on-one contact restric-
tions, limitation on searches, griev-
ance procedure, sexual misconduct,
tracking data, training and physical
plant changes (DxG)

— Summaries of investiga-
tions relating to sexual
misconduct at the female
prisons (DxI–1 to DxI–9)

— Statistics relating to fe-
male prison population
and statistics relating to
corrections officers and
the like gender–race–
ethnicity (DxM–1 to DxM–15)

— DCS approval for selection
certification (DxU–2 to DxU–3)

— Brochure entitled "Appropriate and
Inappropriate Staff and Prisoner
Interactions: A Guide to Sexual
Misconduct Prevention and Inter-
vention, November 1996, updated
September 2000." (DxX–1)

— Prisoner Education Instructor Guide
of May 2000 (Dx–X–2)

### 3. Joint Exhibits

Joint exhibits were:

— Staffing Summaries for Female
Facilities (June 2001) (Jx1)

— Staffing Summaries for Camp
Brighton (March 2002) (Jx2)

### VII. Statistics

Because much was made at trial of the statistics regarding sexual misconduct involving female inmates, a separate discussion is in order.

There were a host of exhibits in evidence relating to statistics. The conclusion to be drawn from them is not easy. First, to properly understand what the statistics reflect the year in which an incident occurred must be differentiated from the year in which the allegation was made and the year in which a finding was memo-

rialized. Also, incidents involving the CO's and the RUO's in the housing units in the female prisons must be differentiated from incidents involving other male staff in the female prisons such as, for example, maintenance mechanics, storekeepers, instructors, yard officers, and kitchen workers. Lastly, incidents of sexual misconduct, incidents of sexual harassment and incidents of overfamiliarization must be differentiated because of their descending order of seriousness and what they display regarding improper conduct.

The MDOC keeps detailed statistics which display individual incidents of improper conduct in each of the female prisons year-by-year, as well as the results of the investigation of such an incident, i.e. sustained, not sustained, unfounded, other, and pending. None of the parties, however, in their proposed findings attempted to draw any conclusions from the statistics as to how pervasive is the problem of improper conduct in the housing units in the female prisons. The statistics overall show that with the closing of Florence Crane and the implementation of the requirement of the settlement agreements, the allegations of improper conduct have gone down as follows:

| Year | Allegations | Finding Sustained |
| --- | --- | --- |
| 1998 | 57 | 22 |
| 1999 | 40 | 3 |
| 2000 | 25 | 0 |
| 2001 | | 0 |

The MDOC and the intervening defendants in an effort to counteract the picture displayed by the substantial drop in allegations of improper conduct average them over the period 1994 to date of trial and then translate them into percentages. Included are incidents at Florence Crane without regard to the fact that it was Florence Crane that was the target in the court cases.

The MDOC takes the position that no level of sexual misconduct is acceptable in the operation of a prison and that allegations of sexual misconduct, meritorious or not, are statistically significant and justify the BFOQ requirement. As will be discussed, however, something more is required for defendants to make their case.

## VIII. The Right Of Plaintiffs To Bring Suit

### A.

■ Strangely, defendants contest the right of plaintiffs to challenge the BFOQ initiative on the grounds that it would not have an adverse employment affect on any of them. This challenge ignores the pending motion for class certification and particularly defendants response to the motion which states in part:

> There is no need for a class action because the injunctive and declaratory relief sought by Plaintiffs would apply to all those similarly situated. Therefore, Plaintiffs' request for class certification should be denied because there is no reason for a class.

Presumably, as far as the MDOC is concerned, the dislocation of CO and RUO's, male and female, occasioned by the DCS approval of the BFOQ request is *de minimus* and, therefore, no CO or RUO has standing to challenge it.

■ The law is well settled that "a tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). What is required is a " 'materially adverse' change in the terms or conditions of employment because of the employer's action," *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir.2000).

### B.

Here, as previously described, the impact on the female prisons is significant. Sixty percent (60%) of the positions in the housing units in the female prisons in Michigan would be limited to females and between 70 and 75 male CO and RUO's and 147 female CO and RUO's would be removed from their assignments and as many as 23 male CO and RUO's would be transferred to a different prison. Some of these officers would lose the job opportunity to bid for different positions and may also suffer promotional opportunities. Plaintiffs Idemudia and Sahl described in some detail, *see* Part VI. C., *supra*, the dislocation in their work and personal lives they would suffer if the CO's and RUO's positions in their work places were made female only in the housing units in which they work. This is certainly enough of a basis to allow them to file suit, notwithstanding the fact that MDOC effectively concedes that others in like positions would also suffer from the same disadvantages and dislocations.

### C.

The cases cited by the MDOC are not to the contrary and the effort to urge the Court to follow them as precedent tends to trivialize the effort the MDOC is making to justify the BFOQ. In *Bowman v. Shawnee State University*, 220 F.3d 456 (6th Cir.2000), plaintiff was removed from his position for 10 days with no loss of monies. In *Hollins v. Atlantic Co., Inc.* 188 F.3d 652 (6th Cir.1999), plaintiff complained of lower evaluations, which nonetheless resulted in merit raises. In *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876 (6th Cir.1996), an admonition without a change in pay, benefits, duties, or prestige was involved. Finally, in *Yates v. Avco Corp.*, 819 F.2d 630 (6th Cir.1987), the issue was

a requested transfer with the same salary and benefits.

Confining the CO and RUO's positions in the housing units in the female prisons in Michigan is a sea change in MDOC personnel policies. Plaintiffs have every right to make the challenge.

## IX. The BFOQ

### A. The Law Generally

■ No useful purpose will be served by a general discussion of the law of sex discrimination applicable to the issue here or the conditions required to establish a BFOQ generally. Suffice to say, that to maintain a BFOQ requirement for a position, an employer must establish by a preponderance of the evidence three essential facts. First, the employer must establish that there is a basis for the belief that all or substantially all males will be unable to perform safely and efficiently the job. *See International Union, United Auto., Aerospace, and Agr. Implement Workers of America, UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 207, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991), ("... Johnson Controls has shown no 'factual basis for believing that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved.' "); *Dothard v. Rawlinson,*[33] 433 U.S. 321, 333, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) ("it is impermissible under Title VII to refuse to hire an individual woman or man on the basis of stereotypical characteristics of the sexes...").

Second, the job qualifications which males are unable to perform relate to the essence or central purpose of operating the business at hand. *See International Union,* 499 U.S. at 203, 111 S.Ct. 1196 ("[In *Dothard*] we stressed that in order

to qualify as a BFOQ, a job qualification must relate to the 'essence' ... or to the 'central mission of the employer's business.' ").

Third, the employer must establish that there is no reasonable alternative to employing females exclusively in the position for which the BFOQ is sought. *See International Union,* 499 U.S. at 193, 111 S.Ct. 1196.

### B. The Law Particularly

#### 1. Female Prison BFOQ

Plaintiffs cite five cases dealing specifically with the female BFOQ in a female prison. While the five cases do not cover the universe of cases in which a female BFOQ for a corrections officer in a female prison was the issue, a discussion of each of these cases is sufficient to reflect the fact/law combination underlying the decision here.

*Forts v. Ward,* 621 F.2d 1210 (2d Cir. 1980), involved a challenge by female inmates to the assignment of male corrections officers to duties in the housing and hospital units of the facility in which they were housed. The district court granted a preliminary injunction on the grounds the plaintiffs were likely to prevail on the merits since such assignment violated the inmates' constitutional right of privacy without serving any legitimate and compelling state interest and the assignments were not required by the Civil Rights Act of 1964. On appeal, the Court of Appeals for the Second Circuit reversed the grant of the preliminary injunction and remanded the case for an evidentiary hearing on the grounds disputed issues of fact were present. *See Forts v. Ward,* 566 F.2d 849 (2nd Cir.1977).

---

33. *Dothard* effectively held security considerations validated a prohibition on female corrections officers working in a male prison. As described in *Griffin v. Michigan, supra,*

"[i]n *Dothard,* the Supreme Court was considering a brutal, jungle-like, maximum security environment in Alabama."

On remand, following an evidentiary hearing, the district court adhered to its initial decision and required the State of New York to provide either assignment schedules or physical changes, "while maximizing equal job opportunity, will afford each inmate the minimal privacy which the Court concludes she is entitled." *Forts v. Ward*, 471 F.Supp. 1095, 1102 (S.D.N.Y. 1978). The district court was particularly concerned with male officers having an opportunity to see female inmates using the toilet and showering, as well as observing the females in other circumstances which their privacy rights were being violated, particularly on the night shift.

On a second appeal, the Second Circuit again vacated and remanded the district court's decision, and spelled out in some detail just what was necessary to "satisfactorily accommodate" the "competing interests" before deciding whether "one interest must be vindicated to the detriment of the other." *Forts*, 621 F.2d at 1212. The court of appeals decision makes no mention of security interests or of elimination of improper conduct as the basis for limiting male corrections officers' right to work in a female prison.

In *Edwards v. Department of Corrections*, 615 F.Supp. 804 (M.D.Ala.1985), the district court rejected a claim that a female BFOQ was of the essence of the job of shift commander in a female prison noting particularly that "the [prison officials] failed to prove that the nature of the prison's operation precludes rearranging job responsibilities in a way that would eliminate the clash between the privacy interests of female inmates and the employment opportunities of male officers as shift commanders." *Edwards*, 615 F.Supp. at 809. Again, neither security interests or elimination of untoward conduct was an issue.

In *Torres v. Wisconsin Depart. of Health and Social Servs.*, 859 F.2d 1523 (7th Cir.1988) (en banc), male prison guards challenged a female BFOQ for the position of guard in a female correctional institution. The district court sustained the challenge, finding that the state failed to satisfy the requirement for a BFOQ and did not attempt to utilize administrative alternatives to accomplish their goal without violating the national policy against sex discrimination and failed to justify the plan based on security, rehabilitation or privacy reasons. The Court of Appeals for the Seventh Circuit initially, in a 2–1 decision, affirmed the district court. *Torres v. Wisconsin Dept. of Health and Social Servs.*, 838 F.2d 944 (7th Cir.1988). On rehearing, in an 8–3 decision, the Court of Appeals reversed the district court on the grounds the prison officials were held to a too strict standard of proof, *i.e.* objective evidence either from empirical studies or otherwise, displaying validity of their theory that rehabilitation of inmates in a female maximum security facility would be enhanced by employing only female correctional officers in certain positions. In remanding for further consideration, the Seventh Circuit said:

> We believe ... the defendants were ... Given the nature of their "business"—administering a prison for female felons—the defendants, of necessity, had to innovate. Therefore, their efforts ought to be evaluated on the basis of the totality of the circumstances as contained in the entire record. In the Title VII context, the decision of penal administrators need not be given as much deference as accorded their decisions in constitutional cases.
>
> .     .     .     .     .
>
> *However, their judgments still are entitled to substantial weight when they are the product of a reasoned decision-making process, based on available information and experience.* The fact that the

program is considered a reasonable approach by other professional penologists also is a factor to be given significant consideration. In an area where the questions are so many and the answers so few, the range of reasonable options must necessarily be more extensive. Certainly, the court ought not require unanimity of opinion and ought not to substitute completely its own judgment for that of the administration.

*Torres,* 859 F.2d at 1532 (emphasis added, internal citations and footnote omitted).

In *Torres,* the sole basis for requiring further consideration by the district court was the rehabilitation justification; privacy and security consideration did not offer a justification for the BFOQ:

> . . ., we emphasize that it would be a mistake to read our decision today as a signal that we are willing to allow employers to elude Title VII's requirements simply by arguing that they were "innovating." Rare is the employment situation in which an employer could argue that gender-based distinctions are a "reasonably necessary" approach to innovation in one's business. We hold only that, given the very special responsibilities of these defendants and the obvious lack of guideposts for them to follow, it was error to require that they adopt only a course that was subject to objective validation.

*Id.* at 1533.

In *Multnomah County Corrections Officers Ass'n v. Multnomah County,* 1989 WL 51003, 1989 U.S.Dist. LEXIS 5086 (D.Or.1989), male corrections officers challenged a policy of prohibiting them from working in female inmate housing modules. The district court denied defendants' motion for summary judgment on the grounds there were genuine issues over material facts which required resolution by trial. While the district court acknowledged that some deference must be paid to the administrator's decision, importantly it noted, "It is necessary to determine whether such judgments are supported by the available evidence or whether they are based on stereotypical assumptions." *Multnomah,* 1989 WL 51003, *3, 1989 U.S.Dist. LEXIS at *9.

In *Robino v. Iranon,* 145 F.3d 1109 (9th Cir.1998), male correctional officers challenged a policy of assigning only female correctional officers to six posts in a Hawaii prison housing female inmates, each of which included a "First Watch" position. The Court of Appeals for the Ninth Circuit turned back the challenge. The district court found that female gender was a BFOQ reasonably necessary to "accommodate the privacy interest of the female inmates and reduce the risk of sexual conduct between [the male officers] and [the female] inmates." *Id.* at 1110. The Ninth Circuit, in affirming, stated:

> After a study conducted by a specially appointed task force in compliance with an EEOC settlement agreement, prison officials authorized by the Department of Personnel Services determined that the best policy to protect female inmates and to prevent allegations of sexual misconduct was to designate six posts as female-only. This professional judgment is entitled to deference.

> The policy limits eligibility for such a small number of positions (six out of forty-one) that it imposes such a de minimus restriction on the male ACO's employment opportunities that it is unnecessary to decide whether gender is a BFOQ for the few positions affected . . . . In such circumstances, "[t]he conflict between the right of one sex not to be discriminated against in job opportunities and the other to maintain some level of privacy has normally been resolved

by attempting to accommodate both interests through adjustments in scheduling and job responsibilities for the guards." ... The male ACO's have not suffered any tangible job detriment beyond a reduced ability to select their preferred watches.

. . . . .

Assuming arguendo that plaintiffs raise a colorable Title VII claim, however, we conclude that gender constitutes a BFOQ for the six posts at issue here....

. . . . .

The record amply supports the claimed BFOQ. WCCC adopted its current policy of assigning only female ACO's to posts that raise inmate privacy or safety concerns based on the serious allegations and the ensuing problems with morale among both the inmates and the ACO's. *To comply with an EEOC settlement, it conducted an extensive survey of post duties before determining which posts should be designated female-only.* Each designated female-only post is residential and requires the ACO on duty to observe the inmates in the showers and toilet areas for the prison's own security or provides unsupervised access to the inmates. The state's legitimate penological interests outweigh whatever interest the male ACO's may have in standing the watches of their choice. Viewing the evidence in the light most favorable to the plaintiffs, the defendants have met their burden of demonstrating that their policy is reasonably necessary to the operation of the WCCC. The defendants have established these six female-only posts are a reasonable response to the concerns about in-

mate privacy and allegations of abuse by male ACO's.

*Id.* at 1110–1111 (citations omitted) (emphasis added).

What is important to the decisions in *Torres* and in *Iranon* is that the prison officials, before making the change, conducted extensive studies of the prison environment and came to reasoned conclusions that for particular penalogical reasons the female BFOQ was appropriate. In *Torres,* the district court was directed to reconsider its ruling based on the totality of circumstances presented in justification and in *Robino* only a limited number of positions were involved and the dislocation complained of was *de minimus.*

## 2. No Reasonable Alternatives

In addition to establishing that the BFOQ is necessary to the safe and efficient operation of the female prisons, the MDOC must also establish that there are no reasonable alternatives available to excluding male CO and RUO's from the female housing units. *See Reed v. County of Casey,* 184 F.3d 597, 599 (6th Cir.1999) ("Defendant ... has the burden of establishing that no reasonable alternatives existed" to meet state requirements against male deputy jailers supervising female prisoners alone);[34] *Hardin v. Stynchcomb,* 691 F.2d 1364, 1374 (11th Cir.1982) ("Defendants ... have failed to prove they cannot rearrange job responsibilities so that female deputies assigned to male sections of the jail will not have to perform duties that impinge upon inmate privacy rights."); *Forts v. Ward,* 621 F.2d 1210, 1217 (2d Cir.1980) ("We ... conclude that ... the remedy proposed by the State will accord adequate protection to the privacy interests of the inmates by means that will

---

**34.** In *Reed,* the Sixth Circuit upheld a BFOQ for a female jailer on the third shift in a county jail housing female prisoners as a consequence of a state regulation that a female jailer be present whenever a female inmate was lodged in a jail. The alternative was to transfer female prisoners to neighboring jails.

avoid any denial of the guards' right to equal employment opportunities."); *Gunther v. Iowa State Men's Reformatory,* 612 F.2d 1079, 1086 (8th Cir.1980) ("In addition to showing that the hiring of women at Anamosa would undermine the essence of the prison administration, Anamosa must also demonstrate it could not reasonably rearrange job responsibilities in a way to minimize the clash between privacy interests of the inmates, and the nondiscrimination principle of Title VII.").

### 3. Female Inmates Rights

Female inmates retain the right to be protected against unwarranted intrusion by male corrections officers and denying the BFOQ request does not give right to the MDOC to give co-extensive job responsibilities to male and female CO and RUO's. *Smith v. Fairman,* 678 F.2d 52, 54 (7th Cir.1982). For example, male CO and RUO's cannot strip search female inmates, *Cornwell v. Dahlberg,* 963 F.2d 912, 915–16 (6th Cir.1992) (strip search of male inmates before female corrections officers raises a valid privacy claim under Fourth Amendment). *See also Hardin v. Stynchcomb,* 691 F.2d 1364, 1373 (11th Cir. 1982) ("while it is important to maintain order and security within [a] jail ... inmates' retained privacy rights may be unnecessarily invaded by deputies [housing corrections officers] of the opposite sex conducting strip or body cavity searches, or oversee use of toilet and shower facilities.").

## X. Findings

### A. Facts

■ Based on the testimony at trial, the exhibits received in evidence, and the inferences to be drawn from them, seven overall factual findings, some of which have been described in detail above, are determinative of the Court's conclusion that MDOC and the intervening defendants have not made out a case for a female-only BFOQ in the housing unit of the female prisons.

First, standard practices nationwide provide for the employment of male corrections officers in female prisons. Admittedly there are limitations on the scope of the *tasks* male corrections officers can perform and additional physical structure over-and-above that generally called for in a housing unit is necessary. However, there is nothing unique about the operation of the female prisons in Michigan which suggests that the BFOQ is necessary for the MDOC to perform its mission or the essence of the business of running a female prison requires a BFOQ. Moreover, the standards set by the ACA do not exclude male corrections officers from the housing units in female prisons.

Second, internal studies by the MDOC do not support the elimination of male CO's and RUO's from the housing units in the female prisons. The GSAC's recommendation have already been discussed. A second study commissioned by the MDOC following the settlement of the United States case, *Report On Staffing Feasibility Study of Scott and Florence Crane Correctional Facilities* by Charles J. Kehoes and Nelda C. Leon, for Securior New Century, LLC, dated August 20, 1999 (referred *supra* as "the Securior report"), while recommending strategies to increase the number of female corrections officers in the housing units did not recommend a female BFOQ for the CO's and RUO's in the housing units. There is no evidence that the MDOC has attempted to implement the Securior recommendations. Additionally, as previously stated, aside from Martin's views on the desirability of the female BFOQ requirement, there is no evidence that any MDOC official supported it at the time the request was made to DCS for selective certification.

Third, the concern over cross-gender supervision leading to the application for a BFOQ began with Martin when in 1988, as a member of the state legislature, he participated in a hearing regarding the murders of a male corrections officer and a female corrections officer, both in male prisons. Martin, on becoming director of the MDOC, began looking into eliminating cross-gender supervision and while he initially hoped to achieve this in both the male and female prisons he very early decided to focus only on the female prisons.

Fourth, the expert opinions offered by plaintiffs are considerably more credible and should be given greater weight than those offered by MDOC. The plaintiffs' experts have had hands-on experience in the operations of female prisons. The defendants' experts have had no direct experience in the operations of female prisons. The experts' testimony proffered by the female inmates replicates what they said in the female inmates court case and there they did not opine that a female BFOQ for housing unit corrections officer was necessary to deal with the abuses they found existed.

Also, the MDOC experts were not familiar by-and-large with the internal MDOC study and not familiar with other studies which have dealt with the problem associated with abuses in female prisons occasioned by lax control of male corrections officers and particularly poor correctional practice such as pat-down searches by them. Why the MDOC preferred to rely on expert testimony rather than the opinion of its senior officials and particularly those dealing with the operation of the female prisons in Michigan, was not explained. While Yukins is undeniably a respected professional in the corrections field, the radical change in her position diminishes the weight to be given her opinion.

Fifth, the ameliorative requirements of the changes called for by the settlement agreements in the court cases have only recently been implemented. Changes in physical structures, reporting requirements, staff interactions and the like have created a whole new environment in the female prisons. The court-appointed monitoring has only recently been concluded.[35] The monitor testified he did not intend to recommend a female BFOQ for the CO's and RUO's. The move to take the male CO's and RUO's out of the housing units in the female prisons was initiated shortly after the settlement agreements were signed. No effort has been made to assess the changes required by the settlement agreement.

Sixth, although the statistical evidence relating to improper interaction has already been discussed it bears repeating that the statistics show a substantial decrease in improper conduct since the implementation of the changes called for by the settlement agreements.

Finally, the published literature on the presence of male correctional officers in female prisons does not support a female BFOQ for corrections officer in the housing units in a female prison. Much of this literature is listed in an attachment to the Memorandum of March 23, 2001 filed at the conclusion of the trial. As stated in the Memorandum:

> Studies in the literature, listed in Exhibit B, do not support the need for wholesale change or complete exclusion of male correctional officers from female housing units. In fact, some of the studies suggest the contrary: that it is desirable to have mixed gender correctional

---

**35.** To date, the monitor has not issued a final report. Apparently, a visitation to the female prisons is scheduled for August and a final report is expected in September of this year.

officers in the housing units and that female prisoners view this favorably. *See* Memorandum of March 23, 2001 at p. 9.

### B. Reasonable Alternatives

There is really no need to discuss reasonable alternatives. There has simply been no showing that there is reasonable cause to find that all, or substantially all, males are not able to perform safely and efficiently the duties of a CO and RUO in the housing units in the female prisons. Very few male CO or RUO's are likely to be involved in improper activities. The few that are likely to be involved does not justify a BFOQ requirement in the face of federal and state law clearly prohibiting gender based discrimination.

However, even considering reasonable alternatives, which are better expressed as additional requirements, the Securior study identified the following reasonable alternatives to employing female CO and RUO's exclusively:

—covering vacancies with females
—increasing female coverage where necessary with overtime
—redeployment of female officers in supervisory positions

The MDOC has never explored these recommendations. Once Martin made his decision there appears to have been no effort to change existing staffing patterns in the housing units.

The policy that each CO and RUO conducting five pat-down searches per shift appears to be still in place. Elimination of the requirement would lessen the tensions which must inevitably result from the male staff-female inmate interaction occasioned by this requirement.

Moreover, no effort has been made to enhance pre-employment screening of new CO's and RUO's to lessen the likelihood of employing high risk male CO's and RUO's in the female prisons. Such testing has been used in other prison systems in the United States.

In sum, the MDOC has done nothing aside from implementing the requirements of the settlement agreements to enhance the conditions under which the male CO's and RUO's in the housing units relate to the female inmates under their charge.

### C. Continued Incidents

That there may be continued allegations of improper interaction, as well as incidents, does not support a BFOQ requirement. The statistical evidence shows that the changes required by the settlement agreements have lessened the number of such allegations and incidents. Particularly, the incidents of sexual misconduct have been reduced to almost zero and the most recent reported allegation did not involve a CO or RUO. Additionally, the changes in policies and procedures are of recent origin such as screening of job applications, staff training and prisoner education and facilitation of reporting of improper interactions. Physical modifications are also of recent origin. It is simply too early to gauge the full impact of these changes.

### XI. The Intervening Female Inmates' Case

As a consequence of the independent status of the female inmates as intervening parties defendant a brief discussion of their arguments in support of the BFOQ requirement and why they do not carry the day for them is in order.[36]

---

36. The female inmates put their arguments under seven major headings. Because the arguments are sometimes repetitious and more often than not are directed to what they believe is good corrections policy rather than what is required by equal opportunity laws, each of the points will not be discussed separately.

### A. "The Harm To Plaintiffs Is Speculative And, At Most Minimal"

This assertion has already been discussed and the Court has explained why plaintiffs have standing to challenge selective certification. As previously described, some 270 CO's and RUO's would be adversely effected by approval of the BFOQ. If the female inmates' view of the minimal dislocation occasioned by limiting CO's and RUO's to female corrections officers only in the housing unit is correct; there appears to be no impediment to the MDOC making the change without the certification requested of the DSC. Obviously this is not the position of the MDOC. Additionally, in negotiations during the settlement agreement in the female inmates case the opportunity was present to negotiate for housing unit corrections officer qualifications much in the way that changes in practice and procedures were negotiated and this was not done. Effectively, the female inmates are trying to obtain in this case what they failed to obtain in the female inmates case.

### B. "Since Plaintiffs Do Not Contest Right Of MDOC To Make Gender Specific Tasking Assignments MDOC Is Entitled To Make The Tasks Of CO And RUO's In The Housing Units Gender Specific"

This argument assumes too much from the plaintiffs' position regarding gender specific tasking. Male corrections officers began working in the housing units in female prisons back in 1985 at about the same time female corrections officers began working in male prisons. The introduction of female corrections officers in male prisons has been considerably less controversial than the obverse. Prison authorities over the years have not been as sensitive as they should be to the need to limit certain of the tasks in female prisons to female corrections officers. Females being viewed by males is qualitatively different than males being viewed by females. The MDOC learned this in the court cases; the settlement agreements establish this. Strip searches, observation of female inmates while undressed, and staffing of medical visits are all discrete *tasks* which should be limited to female corrections officers as is transport under some circumstances. Pat down searches are of the same order. The Securior study supports gender specific task assignments. All this, however, does not make out a case for gender specific assignment of CO's and RUO's in the housing units and plaintiffs' willingness to accept the principle of gender specific tasks does not mean they concede the MDOC's position. What all this means is that the MDOC should be using a scalpel rather than a meat ax approach to staffing tasks in the female prisons.

### C. "Assigning Males To Housing Units Solely to Achieve General Neutrality In Employment And Without Regard To Gender Differences Has Proven To Be A Mistake"

First, the record does not support a finding that the MDOC, in assigning male CO's and RUO's to the housing units in the female prisons, is engaged in some kind of affirmative action program or that there are not problems associated with the presence of male CO's and RUO's in the housing units in the female prisons.

The court cases were precisely about the problems associated with the presence of male corrections officers in the female prisons and the failure of the MDOC to recognize that it should not deal with cross gender supervision in the female prisons in the same manner as in the male prisons.

The female inmates are correct when they say:

Male and female prisoners handle situations quite differently. There are security concerns with males that are not

present with females. Gladwin, TR I, p. 104. There is a big difference in operating male and female institutions. All the literature describes how women handle incarceration differently. They enter prison with different issues than men and respond to authority differently. Women are more emotional and cry more easily than men, while men are more methodical and calculating. I–D Exh. 19, *Special Report on Female Offenders in Florida,* pp. 3–4, 8, 10. Women are more vocal about their complaints, but with women, staff do not have to worry about assaults, killings, and homemade weapons. Women also have different emotional needs. Many are mothers 'worried sick about their children.' Many have drug dependency issues. A large number of women report abuse of some form—sexual, physical, and verbal.

These phenomena are well known in corrections. Yet they have not resulted in any effort nationally to take male corrections officers out of female prisons. Rather, as previously discussed, there is simply no support for the position that the phenomena cannot be dealt with the presence of males in female prisons.

What can be drawn from this is that:

—the change in policies and procedures occasioned by the settlement agreements must be given an opportunity to take hold

—some care must be taken in which particular tasks are assigned as CO's and RUO's in the female prisons. Psychological screening of prospective employees should be instituted. (The record does not support MDOC's position that it is not effective but rather suggests psychological screening should be used.)

What the female inmates urge as policy is better directed to the ACA and to the Congress and the state legislature. What the female inmates ask for is essentially a political question and not a legal requirement.

### D. "MDOC Is Obligated To Take All Reasonable Steps To Prevent Abuses From Continuing In The Female Prisons"

No one disputes this. This is what the court cases were all about. Nothing dramatically different occurred following the signing of the settlement agreements to cause the need for a sea change in staffing policy which would be the consequences of selective classification. McManus and Yukins each changed their minds it is true; their reasons for doing so does not pass muster. The reason for this case is that Martin became director and he came to the position with a stereotypical view of the role of sex in employment in male and female prisons: males guard males and females guard females. Without consulting his staff and without a review of internal studies, national policies or the literature Martin, and Martin alone, decided the change was appropriate and the MDOC staff fell in line. Martin had no qualifications from past training employment or experience to make a reasoned judgment on the subject and his leaving corrections as a profession simply confirms this.

### E. "Making Gender A BFOQ For Female Housing Unit Officers Is Reasonably Necessary To Achieve MDOC's Core Mission"

In making this argument, the female inmates do not define the MDOC's core mission. Rather, referring to selective bits of trial testimony they argue that the steps required to be taken by the settlement agreements and the changes in physical environment in the female housing unit are insufficient to assure that not only

will there never be an act of sexual misconduct, sexual harassment or overfamiliarity but that there will never be an allegation of improper interaction. Again, the statistics do show a dramatic drop in the allegations of sexual misconduct. In reality, the statistics are not sufficiently discrete to make a finding about the significant allegations of sexual harassment or overfamiliarization. What is known only is that no staff member of MDOC except Martin and Yukins have expressed an opinion of the need to exclude male CO's and RUO's from the female prisons.

## XII.  National Profile of Corrections Officers in Female Prisons

At the request of the Court shortly after the case was filed, the MDOC surveyed the other 49 states and the Federal Bureau of Prisons for information regarding the staffing of housing units in female prisons. Forty-eight states and the Bureau of Prisons responded. The results of the survey follow:

—In four states corrections officer positions in the housing units are limited to female corrections officers

—Twenty-six states have a requirement that a minimum number of female corrections officers be available to perform selected tasks

—Twenty-two states have no minimum required number of female corrections officers

—Thirty-one states have gender-specific assignment for certain tasks such as transportation runs, strip searches, urine collection and medical appointments.

## XIII.  Conclusion

After all is said and done, the Court's view of the fundamental principles which must be balanced, as stated on March 23, 2001 at the conclusion of the proofs, still obtain:

—there is no justification for a blanket ban on employment of male corrections officers in the female prisons in Michigan [37]

—The MDOC has the right to limit certain tasks in the female prisons to female corrections officers, particularly to ensure female inmates' rights to privacy bearing in mind at all times the security interest of the corrections officers.

The fundamental difficulty with the MDOC's decision to ask the DCS for a BFOQ requirement for the CO and RUO's in the housing units in the female prisons is that the decision reflected neither reasoned decision making nor professional judgment, but rather the consequence of a belief of one person, not a correctional professional, in a transitory position of authority, that it was best for the female prisons in Michigan. There was no consultation with staff and no effort to follow established procedures. Indeed, the established procedures were amended to avoid scrutiny by the state agency which is statutorily charged with review such requests. The end result to all of this was to make what should have been a reasoned policy decision into a judicial dispute. This was wrong.

There are tasks in the running of a female prison as has been explained above which should not be performed by male corrections officers such as strip searches and body cavity searches. It should not

---

**37.** Today approximately 30% of the correctional officers in the male prisons in Michigan are female. To have one policy in male prisons and another in female prisons regarding cross-gender supervision suggests stereotyping beyond the confines of prison operation policies. *See* Teresa A. Miller, *Keeping the Government's Hands Off Our Bodies: Mapping A Feminist Legal Theory Approach To Privacy In Cross—Gender Prison Searches,* 4 Buffalo Crim.L.Rev., 861 (No. 2) (2001).

be difficult to define these tasks and adjust CO and RUO duties in the housing units in the female prisons accordingly. Nothing in the decision here to deny the BFOQ's requirement should be read to prohibit the MDOC officials from making gender specific task assignments. The vast majority of female prisons in the United States appear to manage their populations safely and efficiently and still comply with the requirements of equal employment opportunity laws. Nothing in the record here suggests the MDOC can not do the same thing.

Lastly, it should be clear that this decision recognizes, as stated in *Turner v. Safley*, 482 U.S. 78, 84—85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and most recently reaffirmed in *McKune v. Lile*, 586 U.S. ——, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002):

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities.

This principle has not been violated here. A past director of the MDOC made a decision and tried to translate the decision into a courtroom judgment. The effort failed because the decision was contrary to law. This is not a circumstance where the Court is being asked to accord deference to the decision of prison authorities but rather a circumstance where the Court must balance the decision of prison authorities against the equal employment opportunity requirement of the law. The state of Michigan has an established procedure for engaging in such balancing. Here, there was not only a bypass of that procedure but the absence of any evidence that the prison authorities made any attempt at balancing. It is for all of these reasons that plaintiffs are entitled to the declaratory relief they request.

### DECLARATORY JUDGMENT

For the reasons set forth in the Decision entered this date, finding in favor of plaintiffs on their request for declaratory relief, **IT IS ORDERED, ADJUDGED AND DECREED** that gender-based assignments to the Corrections Officer positions and Resident Unit Officer positions at the Scott Correctional Facility, Western Wayne Facility, and Camp Brighton Facility constitute gender based discrimination in violation of Section 703 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), and Section 207 of Michigan's Elliot–Larsen Civil Rights Act, M.C.L. § 37.2202.

## Exhibit H

MICHIGAN CIVIL RIGHTS COMMISSION
Michigan Department of Civil Rights - Office of Legal Affairs
1200 Sixth Street
Detroit, Michigan 48226
(313) 256-2998    FAX: (313) 256-1549

---

## APPLICATION
### for
### *BONA FIDE OCCUPATIONAL QUALIFICATION EXEMPTION*

An employer may have a bona fide occupational qualification on the basis of religion, national origin, sex, age, or marital status, height and weight without obtaining prior exemption from the commission, provided that an employer who does not obtain an exemption shall have the burden of establishing that the qualification is reasonably necessary to the normal operation of the business.

Pursuant to Section 208 of the Elliott-Larsen Civil Rights Act, a person subject to Article 2 may apply to the Michigan Civil Rights Commission for an exemption on the basis that religion, national origin, age, height, weight, or sex is a bona fide occupational qualification (BFOQ) reasonably necessary to the normal operation of the business or enterprise. Upon sufficient showing, the commission may grant an exemption to the appropriate section of Article 2. Prior to requesting an exemption, employers must explore alternatives for the purpose of determining that no reasonable alternatives are available. However, an exemption will not be granted if the same facts and circumstances are at issue in a complaint pending before the department or commission.

To request a BFOQ exemption and begin the review process, complete this application, attaching additional pages if necessary. A legal brief in support of the BFOQ is also required and should minimally include: (1) background information and an explanation of the facts you believe justify the BFOQ exemption(s), (2) an in depth analysis of the case law as it pertains to your specific request(s), and (3) proposed findings of fact and conclusions of law. You may also submit other supporting materials for consideration.

Upon receipt of all required documents, your BFOQ request will be assigned to the next Commissioner available on the (blind draw) assignment roster. The assigned Commissioner and legal staff will then review the application for adequacy. The Commissioner assigned will also determine if notice to employees, employee representatives or other interested parties, is appropriate.

The completed application, and other requested materials should be returned to:

Sylvia J. Elliott
Michigan Department of Civil Rights
Office of Legal Affairs
1200 Sixth Street, 7th floor N
Detroit, Michigan 48226

---

1.    Name of employer or entity seeking a bona fide occupation exemption.

2.    Address and telephone number of principal location or place of business.

3.    Addresses of all other locations within the State of Michigan.

4.    Describe in detail the entity's functions, operations and purposes.

5.    Location, or locations, for which an exemption is sought.

6.    Check basis for the BFOQ exemption:

(    ) - Religion          (    ) - Age          (    ) - Sex
(    ) - National Origin   (    ) - Height       (    ) - Weight

7.    Title and description of position(s) for which exemption is sought.

8.    Total number of positions in this classification for which exemption is being requested.

9.  How long has this classification been used?

10. How many current employees, if any, are affected by this exemption?

11. Describe in detail why a bona fide occupational qualification is <u>necessary</u> to the normal operation of the business or enterprise. Also discuss any compelling reason(s) why persons in the group for which exemption is sought, should be exempted, or could not reasonably perform the duties of the position.

12. If the request for exemption is denied, please explain any possible alternatives which may be used and any others which the entity may have explored.

13. Have any civil rights complaints been filed against the entity, on the basis for which a BFOQ is requested, i.e., sex, age, etc.? If yes, list each and give the present status and the name of the local, state or federal civil rights agency involved.

14. Please complete the attached personnel survey. If you are subject to the EEOC reporting system, you may substitute your most recent answer as provided on the EEO-1 Reporting Form in lieu of completing the attached form.

_____    _____
Signature                       Date

_____    _____
Title

Disposition:

( ) - Approved
( ) - Rejected

Michigan Civil Rights Commission

By: _____                    _____
    Signature of Designated Representative                                   Date

_____
          Title

Comments - (Including basis for rejection if applicable)

PERSONNEL SURVEY

DATE:

WORK FORCE BREAKDOWN:

| JOB CATEGORIES | MALE EMPLOYEES | | | | | FEMALE EMPLOYEES | | | | | TOTAL ALL EMPLOYEES | TOTAL ALL MINORITIES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Males | Minorities | | | | Total Females | Minorities | | | | | |
| | | Black | SSA | Asian | Am Ind | | Black | SSA | Asian | Am Ind | | |
| OFFICIALS AND MANAGERS | | | | | | | | | | | | |
| PROFESSIONALS | | | | | | | | | | | | |
| TECHNICIANS | | | | | | | | | | | | |
| SALES WORKERS | | | | | | | | | | | | |
| OFFICE AND CLERICAL | | | | | | | | | | | | |
| CRAFTSMEN (Skilled) | | | | | | | | | | | | |
| OPERATIVES (Semi-skilled) | | | | | | | | | | | | |
| LABORERS (Unskilled) | | | | | | | | | | | | |
| SERVICE WORKERS | | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | | |

*Race/Ethnic Group Designations:*

ALL    All employees in unit
MIN.   Total employees in four minority groups that follow
BLACK  Black employees
SSA    Hispanic employees
ASIAN  Asian American employees
AM IND American Indian employees

BFOQ Application Rev. 10/97